## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

SAVE THE POUDRE, a Colorado nonprofit corporation.

        Petitioner,

   v.

LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity as the Chief of the U.S. Army Corps of Engineers.

        Respondent.

---

## PETITION FOR REVIEW OF AGENCY ACTION

---

### INTRODUCTION

1.    This case involves a Section 404 permitting process through which the U.S. Army Corps of Engineers ("the Corps") authorized construction and operation of a massive dam and reservoir project—called the Northern Integrated Supply Project ("the Project" or "NISP")—which would divert large amounts of water from the Cache la Poudre ("Poudre") and South Platte Rivers to be stored at two new large reservoirs. It would encompass a new 170,000 acre-feet ("AF") Glade Reservoir (the largest in northern Colorado history) near the base of the Poudre Canyon northwest of Fort Collins, to store flows diverted from Poudre River, as well as a new 45,624 AF Upper Galeton Reservoir located northeast of Greeley, to provide storage for water diverted from the South Platte River.

2.    NISP began in 2002 as a joint effort among 15 water providers ("Participants"), facilitated and coordinated by the Northern Colorado Water Conservancy District ("Northern

Water" and interchangeably referred to by the Corps as the "District"), to provide 40,000 AF of

water ("firm yield") annually to meet a portion of the Participants' projected future water

demands. NISP would be constructed, owned, and operated by Northern Water and the

individual Participants would own a perpetual contractual right to a defined portion of NISP

facilities and a defined portion of the water diverted by NISP—assuming the water rights are

available.

3.    By design, NISP was only ever intended to meet a portion of the Participants'

long-term water demands and was never meant to cover their entire expected shortage of firm

water supply. Indeed, the Corps itself repeatedly acknowledged that regardless of whether NISP

is implemented, other new water sources would be needed to meet long-term projected shortfalls

(as well as short-term needs during construction). Rather than a meaningful estimate of actual

need then, the Participants' requested annual yield of 40,000 AF was simply an artificially-

selected portion of their larger projected shortfall based in part on what they could afford at the

time. Yet it is this 40,000 AF number, along with other unduly rigid criteria, that served as a

central premise of the Corps' purpose and need analysis. And their rigid adherence to that

number is largely responsible for the fact that all less environmentally harmful alternatives were

ultimately discarded.

4.    Underscoring the arbitrary nature of this 40,000 AF cutoff is Northern Water's

own representation in a federal loan application that it did *not* in fact need to construct both

reservoirs and could instead move forward with only the Glade Reservoir, which would provide

only *20,000* AF of annual water supply. And despite this admission directly undercutting the key

parameter of the Corps' purpose and need analysis—still rigidly fixated on 40,000 AF of firm

yield and not a drop less—the Corps ignored Plaintiff's request for a supplemental NEPA analysis and moved full steam ahead refining plans to construct two enormous, highly destructive new reservoirs that would further divert and degrade the Cache la Poudre River including its wetlands, surrounding habitat, and aquatic ecology.

5.      The ecological impacts will be astounding. Construction and operation of NISP would permanently degrade important riparian habitat, alter and degrade water quality and circulation, contribute to the loss of significant environmental values, and adversely affect river-based recreational and economic opportunities throughout the region and especially in and through Fort Collins, Colorado's fourth largest city, as well as parts of Larimer County downstream of the mouth of Poudre Canyon. In order to fill the Glade Reservoir, a massive diversion of flows will have to be taken from the already strained Poudre River, which also faces substantial stressors due to population growth, climate change, and decreasing snowpack. In fact, if built, the project would divert about 35% of the water, on average per year, out of the Poudre River as it flows through Fort Collins—on top of the 60% of water that is already diverted out of the Poudre. And in some months and years, that additional diversion could be as high as 65% of the remaining flow through Fort Collins. In particular, the project would result in significant and irreversible environmental effects by depleting the already severely depleted "June Rise," the natural increase in stream flows that occurs during snowmelt and is critical to the overall health of the Poudre River ecosystem.

6.      NISP would also exacerbate the ongoing trend of reducing annual peak daily flows that are necessary to sustain a healthy riverine and riparian ecosystem. The loss of springtime flows would be detrimental both to flood risk and the ecological health of the river.

First, NISP would reduce the river's capacity to move sediment downstream, causing the river bed to become clogged with sediment and accelerating the establishment of woody vegetation along the river channel. This narrowing of the channel, in turn, would reduce the river's ability to manage flood waters and raise flood risk for the surrounding communities. Second, NISP would reduce the essential stream flows that help clean the river bed and maintain a healthy food base of insects and fish for a range of aquatic and terrestrial species. This directly impacts a variety of threatened plant and animal species already under immense stress from climate change, drought, and other threats.

7.     NISP would also have significant impacts to water quality, drinking water supplies, and wastewater treatment requirements. For example, the collective impacts of higher water temperatures, increases in pollution and sewage, and lower water flows—which reduce the habitat's capacity to dilute pollutants and move sediment—would likely lead to higher concentrations of ammonia and E. Coli, decreases in dissolved oxygen, and impacts to other markers of water quality. Indeed, as the City of Fort Collins itself explained, some of these impacts may be so severe as to require affected segments of the river to be added to Colorado's list of "impaired waters" under section 303(d) of the CWA, *see* 13 U.S.C. § 1313(d), or to exacerbate violations of state water quality standards for segments already on the 303(d) list.

8.     In addition to the devastating impacts on the Poudre River itself, the new Glade Reservoir would inundate a 160-acre parcel located northwest of Fort Collins at the base of the Poudre Canyon. Construction of the Glade Reservoir would also permanently destroy or degrade aquatic habitat that is crucial to the survival of the threatened Preble's meadow jumping mouse, and will destabilize the Poudre River's ecosystem, as well as destroy and degrade jurisdictional

wetlands in the valley. The construction and existence of Glade Reservoir will also impact migrating elk and mule deer herds as well as other sensitive plant and animal species. Further, because Highway 287 will be moved from the bottom of the valley to the top of the hill overlooking the valley where Glade Reservoir will be built, the noise caused by vehicles will change the area-wide dynamics of noise pollution affecting both people and wildlife.

9.      NISP also threatens to destroy iconic recreational and aesthetic values of the Poudre River as it flows through Fort Collins—where many residents and visitors enjoy diverse activities such as whitewater kayaking, tubing, swimming, and fishing, as well as biking, walking, and birdwatching on the corridor and open space that runs alongside the Poudre River through riparian habitat. Over the last 40 years, the City of Fort Collins, Larimer County, and Great Outdoors Colorado have bought thousands of acres of Natural Areas and Open Space along the Poudre River corridor in Fort Collins and upstream and downstream in Larimer County, all of which would be degraded by the significant decrease in the flow of water in the Poudre River caused by NISP.

10.     Finally, NISP would accelerate the buy up and subdivision of farm land in northern Colorado with cascading economic impacts to rural communities. Some of the water currently available to farmers in the Poudre and South Platte basins would be lost to agriculture forever because it would be diverted from the Poudre and sent by canal and pipe to NISP participants to serve population growth. This loss of farms and farm water would have corresponding impacts on the agricultural economy in northern Colorado, including agricultural businesses and small, rural towns throughout the region.

11.     Given these wide-ranging and devastating impacts, it is no surprise that there was broad opposition to NISP from the start. In addition to Petitioner and other environmental organizations, the City of Fort Collins has consistently voiced concerns about the environmental impacts to the city, the Corps' inadequate and flawed impact analyses, and the concern that this in turn would lead to an "underestimation of impacts and insufficient mitigation." The Fort Collins City Council voted unanimously to oppose NISP and the City's repeated efforts to provide detailed recommendations to help mitigate the wide-ranging environmental harms from NISP were never meaningfully addressed by the Corps. Like Petitioner, the City remains gravely concerned about the threats from this project.

12.     Further, as the costs of the project have ballooned exponentially from an original construction estimate of $146.9 million in 2005 to the current projection of over $2.25 billion, there are now serious questions as to whether NISP even remains economically feasible to satisfy the purpose and need identified by the Corps. Likewise, Northern Water was forced to jettison its proposed WaterSecure program—a plan in which Northern would have purchased 25,000 AF of its claimed 40,000 AF annual "need" directly from northern Colorado farms—in light of skyrocketing prices for land acquisition in the region. In light of these substantial, consequential changes since Northern's original permit application, there is no evidence that the Participants— smaller towns and water districts—have the capability to raise enough money to actually fund the project to obtain a firm yield of 40,000 AF of water based on the NISP participants' current water rights and other economic and logistical hurdles.

13.     Despite these staggering environmental impacts, widespread opposition, and dire financial circumstances, the Corps nonetheless spent 18 years fine-tuning Northern Water's

original proposed project and, in December of 2022, authorized construction of the same two reservoirs Northern Water first proposed in 2004, with only marginal design refinements. The Corps did this while ignoring the less environmentally damaging alternatives offered by Petitioner and the City of Fort Collins, among others, and despite repeated urging by the Environmental Protection Agency ("EPA") to re-evaluate its unnecessarily narrow purpose and need statement and rigid alternatives screening criteria, which effectively prevented the Corps from considering any of those other alternatives that could—like NISP—meet a portion of the Participant's future needs and yet—unlike NISP—would have substantially less environmental impact. Indeed, despite the Corps acknowledging in its Draft Environmental Impact Statement ("DEIS") that the 40,000 AF was simply a number requested by the Participants that was a blend of "affordability and need," DEIS at 1-6, and was never intended to cover all or even most of their projected water supply shortfall—the Corps has treated the 40,000 AF firm yield as a hard floor for any potential alternative and eliminated all proposals that fell even slightly short of this target.

14.    The Corps' decision to authorize NISP violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, by adopting an overly narrow statement of purpose and need; adopting unnecessarily rigid screening criteria and thereby failing to adequately consider a reasonable range of viable alternatives; and failing to prepare a supplemental environmental impact statement ("SEIS") to analyze highly pertinent new information about the alternatives analysis for NISP that came to light after the Corps' 2018 Final Environmental Impact Statement ("FEIS"). The Corps' decision also violated the Clean

Water Act ("CWA"), 33 U.S.C. § 1344, by failing to adopt the least environmentally damaging practicable alternative.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346 (civil action against the United States), 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his duty), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the events or omissions giving rise to the claims occurred within this judicial district; the Corps has offices in this district; the waters in question are located in this district; the environmental impacts resulting from the Project will occur in and impact this district; and Petitioner Save The Poudre resides in this district.

17.     This case is filed pursuant to D.C.COLO.LAPR 10.2(c). It challenges the Corps' December 2022 Record of Decision ("ROD"), the Corps' 2018 FEIS for NISP; the Corps' CWA Section 404 Permit issued to Northern Water on January 10, 2023; and the Corps' decision not to conduct any supplemental NEPA review for this project or—in the alternative—the Corps' unreasonable delay in conducting supplemental NEPA review for this project.

18.     This Court may grant the relief requested pursuant to 28 U.S.C. § 2201 (authorizing declaratory relief); 28 U.S.C. § 2202 (authorizing injunctive relief); and 5 U.S.C. §§ 701-706 (providing for judicial review of agency action under the APA).

## PARTIES

19.     Petitioner SAVE THE POUDRE is a grassroots 501(c)(3) nonprofit organization that strives to protect and restore the Poudre River and its environs. Its mission is to promote conservation of the Poudre River through science, public education, advocacy, and litigation in order to enhance the river's adaption to climate change, support river restoration and aquatic species conservation, and prevent unneeded dams and diversions from the Poudre River.

20.     Save the Poudre has approximately 1,000 members and 5,000 supporters, almost all of whom live in Larimer County, Colorado. The organization's members will be harmed by NISP and will suffer aesthetic, public health, recreational, scientific, and other injuries if the project is built as authorized by the Corps' ROD. The organization and its members are also harmed by the Corps' failure to follow the lawfully required procedures contained in NEPA, the CWA, and the APA.

21.     Save the Poudre is further harmed by the actions of the Corps because this decision frustrates the organization's ability to carry out one of its core missions to conserve this river and avoid additional dams, diversions, and reservoirs of water. These federal actions also undermine Save the Poudre's overall mission, which has required the organization—and will continue to require the organization—to spend significant organizational resources opposing this ill-advised project. Save the Poudre has already been forced to spend considerable resources on this advocacy, including conducting various public alerts and education about this matter, pursuing media opportunities to further educate the public, lawmakers, and municipal officials about the dangers inherent in this project, initiating an organizing campaign around this issue for approximately two decades, writing letters and emails to appropriate government officials,

retaining subject matter experts to review aspects of this project, preparing lengthy comments during each public comment opportunity, and litigating in state district court. Accordingly, the actions taken by the Corps have not only greatly impeded and frustrated Save the Poudre's mission to protect the Poudre River from new dams, diversions, and reservoirs that will result in significant downstream environmental damage, but it has caused an immediate and continuing drain on Save the Poudre's very limited resources that could otherwise be used for the organization's other advocacy efforts to ensure the ecological health of the river and the surrounding environment and community.

22.    The injuries of Save the Poudre and its members can be redressed by a ruling from this Court declaring the Corps' decision to issue the Section 404 Permit arbitrary and capricious and in violation of NEPA and the CWA; vacating the ROD, FEIS, and Section 404 Permit; and remanding these matters to the Corps for further consideration consistent with federal law.

23.    Respondent LIEUTENANT GENERAL SCOTT A. SPELLMON is the Chief of the U.S. Army Corps of Engineers, which is an agency of the United States within the Department of the Army. Lieutenant General Spellmon is sued in his official capacity. The Corps prepared the ROD and CWA Section 404 Permit authorizing NISP, as well as the FEIS challenged in this action. Accordingly, Lieutenant General Spellmon, as the head of the Corps, is ultimately responsible for the actions challenged herein.

## STATUTORY FRAMEWORK

**A.     The National Environmental Policy Act**

24.     Enacted in 1969, NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b), (c).

25.     Congress enacted NEPA to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA imposes a duty on federal agencies to "use all practicable means . . . to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." 40 C.F.R. § 1500.2(f).

26.     The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500-1508, which are "binding on all federal agencies." *Id.* § 1500.3.[1]

27.     To accomplish its underlying goals, NEPA requires federal agencies to prepare a "detailed statement"—i.e., an EIS—for all "major federal actions significantly affecting the

---

[1] Although the CEQ regulations have been revised multiple times, *see* 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (Apr. 20, 2022), the new regulations do not apply to this case because the FEIS was completed and published in 2018, prior to these revisions, and thus all citations herein are to the pre-revision version of the regulations.

quality of the human environment." 42 U.S.C. § 4332(C). An EIS must describe (1) "the environmental impact of the proposed action," (2) "the adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)-(iii).[2] The environmental impacts that require analysis under NEPA are far broader than just those affecting the ecosystem itself; such effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts. 40 C.F.R. § 1508.8(b). The purpose of the EIS is to "provide full and fair discussion of significant environmental impacts" and it "shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

28.     Each EIS must consider the underlying federal "purpose and need" for the proposed action, and "rigorously explore and objectively evaluate" the environmental impacts of "*all* reasonable alternatives" to the proposed action. 40 C.F.R. §§ 1502.13, 1502.14 (emphasis added). NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). CEQ has deemed the alternatives analysis "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply

---

[2] Although NEPA was amended in part by the Fiscal Responsibility Act of 2023, *see* PL 118-5, 137 Stat 10, (June 3, 2023), those statutory amendments do not apply in this case and all citations are to the version of NEPA in place prior to those amendments.

defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

29.     In evaluating the alternatives of a proposed action, NEPA requires that agencies take a "hard look" at the effects of the proposed action as compared to all reasonable alternatives. *See* 40 C.F.R. §§ 1502.1, 1502.16. The EIS must assess the direct, indirect, and cumulative impacts of the proposed action on the environment, including adverse environmental effects that cannot be avoided, *id.* § 1508.25. Direct effects are those "caused by the action and occur at the same time and place," while indirect effects are those "caused by the action" that occur "later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8. Cumulative impacts are those that result from the "incremental impact[s]" of the proposed action when added to the impacts of other past, present, and reasonably foreseeable future actions, whether undertaken by other federal agencies or private third parties. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

30.     According to the Corps' own NEPA regulations, "[t]he Corps, will in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective." 33 C.F.R. Part 325 App. B § 9(b)(4). "[W]henever the NEPA document's scope of analysis renders it appropriate, the Corps also should consider and express that activity's underlying purpose and need from a public interest perspective." *Id.*

31.     With regard to the alternatives analysis, "[t]he Corps is neither an opponent nor a proponent of the applicant's proposal." 33 C.F.R. Part 325 App. B § 9(b)(5). "Decision options

available to the district engineer, which embrace all of the applicant's alternatives, are issue the permit, issue with modifications or conditions or deny the permit." *Id*. § 9(b)(5)(A).

32.     Moreover, the Corps may rely on information submitted by the applicant, but must independently verify such information. *See* 33 C.F.R. Part 325 App. B(8)(f)(2) (when information required for an EIS is supplied by the applicant, the Corps "should document in the record the Corps' independent evaluation of the information and its accuracy, as required by 40 C.F.R. 1506.5(a)."); *see also* 40 C.F.R. § 1506.5(a) ("The agency shall independently evaluate the information submitted and shall be responsible for its accuracy.").

33.     Where an agency has previously prepared and issued an EIS, NEPA's regulations require an agency to supplement its prior NEPA review when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(i), (ii).

**B.     The Clean Water Act**

34.     The CWA is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA generally prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit. *See id*. § 1311.

35.     Section 404 of the CWA authorizes the Corps to issue permits for the discharge of dredge or fill material into waters of the United States at specified disposal sites. 33 U.S.C. § 1344. Section 404(a) allows the Corps to issue a permit authorizing an applicant to discharge fill into specified disposal sites. *Id*. § 1344(a). Section 404(b) provides the substantive

environmental criteria that the Corps must use to evaluate permit applications and makes the specification of a disposal site subject to Section 404(c), under which EPA may prohibit or withdraw the specification of any site as a disposal site. *Id.* § 1344(b), (c).

36.    The Corps adopted regulations, including a review of public interest factors, to implement its Section 404(a) permitting authority. *See* 33 C.F.R. § 320.4. Specifically, the regulations provide that "[e]valuation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case." *Id.* § 320.4(a)(1). "The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." *Id.* "The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process." *Id.* The Corps must consider a broad range of potential relevant impacts as part of its public interest review, including: "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id.*

37.    EPA also promulgated regulations, known as the "404(b)(1) Guidelines," to establish the substantive environmental criteria that the Corps must use to evaluate permit applications. *See* 40 C.F.R. pt. 230. Thus, the Corps reviews all proposed Section 404 Permits under both the Corps' own public interest factors and EPA's 404(b)(1) Guidelines. 33 U.S.C. § 1344(b)(1); 33 C.F.R. § 320.2(f). A permit must be denied if it is contrary to the public interest

or does not comport with the EPA's 404(b)(1) Guidelines. 33 C.F.R. §§ 320.4, 323.6; 40 C.F.R. §§ 230.10, 230.12.

38.     To ensure these mandatory CWA requirements are satisfied, the Corps must fully evaluate the direct, secondary, and cumulative impacts of the activity, including impacts to aesthetics, recreation, and fish and wildlife. *See, e.g.*, 33 C.F.R. §§ 320.4(a)(1), 336.1(c)(5) (wetlands), 336.1(c)(5) (endangered species), 336.1(c)(7) (scenic and recreational values), 336.1(c)(8) (fish and wildlife); 40 C.F.R. §§ 230.11(a)-(h), 230.20-23 (aquatic ecosystem), 230.30 (threatened and endangered species), 230.31 (fish and wildlife), 230.51 (recreational and commercial fisheries), 230.52 (water-related recreation), 230.53 (aesthetics), 230.54 (parks, national seashores, wilderness areas and similar preserves). In particular, the Corps must set forth its findings in writing on the short-term and long-term effects of the discharge of dredge or fill activities, as well as compliance or noncompliance with the restrictions on discharge. 40 C.F.R. §§ 230.11, 230.12(b).

39.     EPA's 404(b)(1) Guidelines prohibit the Corps from authorizing an application for dredge and fill activities if there is a practicable alternative which would have less adverse impact. *See* 40 C.F.R. §§ 230.10(a), 230.12(a)(3)(i). The Corps must document its findings of compliance or noncompliance with these restrictions. *Id.* § 230.12(b). Practicable alternatives are those alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). "Fundamental to [404(b)(1)] Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will

not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." *Id.* § 230.1(c).

40.     If a project associated with a proposed discharge into a "special aquatic site" is not water dependent, i.e. the project "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose," then "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). Unless this presumption is clearly rebutted, a second rebuttable presumption also applies: "where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." *Id.*

41.     In order to eliminate an alternative from further consideration as impracticable, the project proponent and the Corps must provide detailed, clear, and convincing evidence and information proving why each eliminated alternative is genuinely impracticable in light of overall project purposes, rather than merely undesirable to the project proponent. The preamble to the CWA regulations explains that "[t]he mere fact that an alternative may cost somewhat more does not necessarily mean it is not practicable." 45 Fed. Reg. 85,336, 85,339 (Dec. 24, 1980).

## C.     The Administrative Procedure Act

42.     Under Section 706(2) of the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or when they are adopted "without observance of

procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While an agency may change its policy, practice, or position on a particular topic, it "must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). "It follows that an [u]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.* at 222.

43.     Under Section 706(1) of the APA, a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Unlike claims brought pursuant to Section 706(2) of the APA, which are limited to the administrative record before the agency at the time it issued its final decision, *see Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (internal citation omitted), claims brought pursuant to Section 706(1) of the APA are not limited to the administrative record because ordinarily no record exists for agency inaction (rather than agency action).

## FACTUAL BACKGROUND

### A.    NISP Project Summary

44.     NISP is a joint effort among 15 water providers, facilitated and coordinated by Northern Water, to provide 40,000 AF of "new reliable water supply, which would meet a

portion of the Participants' estimated 2060 water supply needs." FEIS at S-4. NISP would be constructed, owned, and operated by Northern Water through its enterprise and the individual Participants would own a perpetual contractual right to a defined portion of NISP facilities and a defined portion of the water diverted by NISP. *Id.*

45.    The Participants include the following 15 towns and water districts in Larimer, Weld, Morgan, and Boulder counties: Central Weld County Water District, City of Dacono, Town of Eaton, Town of Erie, City of Evans, Town of Firestone, Fort Collins-Loveland Water District, City of Fort Lupton, City of Fort Morgan, Town of Frederick, City of Lafayette, Left Hand Water District, Morgan County Quality Water District, Town of Severance, and the Town of Windsor. FEIS at S-1.

46.    Based on concerns over the limits on future availability of Colorado-Big Thompson units and other existing water sources, the original group of water providers began meeting in 2000 to discuss the potential for developing a new regional water supply. In 2002, this group agreed to formally move forward with NISP by funding an alternatives evaluation. In 2004, Northern Water completed its Phase II Alternative Evaluation Report for NISP (Phase II report), which "identified a preferred project as having a new Glade Reservoir as storage for the Grey Mountain water rights and a new Galeton Reservoir as storage for the SPWCP water rights." FEIS at 1-5.

47.    Northern Water officially proposed the project to the Corps in 2004 and indicated its intention to submit a CWA Section 404 application, ultimately submitted to the Corps in 2008, seeking authorization to discharge fill material into about 51 acres of potential waters of

the U.S. and temporarily impact an additional 19 acres of wetlands and other waters at sites in Larimer and Weld counties, Colorado as part of constructing NISP. *Id.*

48.    Northern Water planned to use two water rights in the proposed project: first, Northern Water planned to divert its existing conditional water rights on the Poudre River (Grey Mountain water rights) and to store these flows at a new Glade Reservoir site. In addition, Northern Water planned to use existing conditional water rights on the Poudre River and the South Platte River. The proposed South Platte Water Conservation Project ("SPWCP") would capture storable flows in the lower Poudre River Basin and the South Platte River Basin to be stored in a new Galeton Reservoir. FEIS at S-4-S-5.

49.    After 18 years—and three separate EISs, discussed in detail below—the Corps approved Northern Water's Section 404 Permit application and authorized construction of Northern's preferred alternative, Alternative 2M, which included storage of water diverted from the Poudre River in a new 170,000 AF Glade Reservoir and construction of the SPWCP, including the new 45,624 AF Upper Galeton Reservoir.

50.    The Corps is the lead agency on NISP under NEPA. Three federal agencies—EPA, the Bureau of Land Management ("BLM"), and FWS—along with several state agencies and Larimer County, are listed as cooperating agencies.



### B.    Northern Water's Development of Alternatives

51.    In 2003, prior to any scoping or environmental impacts analysis by the Corps (discussed in detail below), Northern Water conducted its own study of potential project alternatives for NISP and prepared what it called the Phase II Report in 2004. Based on this alternatives analysis, Northern Water and the Participants "identified a preferred configuration of the proposed Project" that included a new Glade Reservoir with a capacity of 170,000 AF, which would also include "a forebay, pump station, and canal upgrade to convey water diverted from the Cache la Poudre River to the proposed reservoir." In addition, the project identified by Northern Water "would also include a proposed Galeton Reservoir with a capacity of about

40,000 AF" which would also be associated with a forebay, pump station, and pipeline to deliver water diverted from the South Platte River. *See* DEIS at 1-4. They also proposed water exchanges between the Glade Reservoir and the Galeton Reservoir. *Id.*

52.      In 2007, before Northern Water formally submitted a Section 404 Permit application, the Corps reviewed this study, preliminarily identified potential alternatives based on Northern Water's recommendations, and prepared Northern Integrated Supply Project EIS Alternatives Evaluation Report (HDR 2007). Volume II of this report included the Corps' independent alternatives analysis, screening process, and action and No Action Alternatives selection (HDR 2007). *See* SDEIS at 2-2; FEIS at 2-2. In other words, the fundamental structure of the action alternatives—two new large reservoirs (indeed, these two large reservoirs specifically)—was largely pre-ordained by Northern Water before public notice and comment even began.

53.      In this way, the Corps' subsequent analyses served only to refine the parameters of these new reservoirs in order to achieve compliance with the CWA. As the Corps itself said in its Final EIS: "The Corps determined Northern Water's Phase II report provided a thorough compilation of data and alternatives analysis. The Corps completed further refinement of the alternatives screening and selection process to address the requirements of the 404(b)(1) Guidelines. To comply with the Guidelines, the Corps reevaluated all of the alternatives identified in the Phase II report, as well as other new alternatives identified subsequent to the Phase II report and during scoping. Additional detail on the Corps' evaluation of alternatives is found in Volume II of the Alternatives Evaluation Report (HDR 2007)." FEIS at 2-2.

C.    **NISP Scoping Process**

54.    On August 20, 2004, the Corps initiated the public scoping process for NISP by publishing a Notice of Intent in the Federal Register notifying the public of a scoping announcement describing the project, announcing three public scoping meetings, and soliciting public comment. *See* 69 Fed. Reg. 51,640 (Aug. 20, 2004). In addition, on September 9, 2004, the Corps mailed 1,275 scoping announcements and emailed 198 announcements to a list of interested individuals, organizations and agencies. *See* Army Corps of Engineers, Omaha District, Northern Integrated Supply Project Environmental Impact Statement: Scoping Report (March 2005) at 3-4 (hereinafter "Scoping Report").

55.    In the initial Federal Register scoping notice, the Corps described NISP as a "collaborative regional water supply project between 15 water providers (Participants) and the Northern Colorado Water Conservancy District acting by and through the Northern Integrated Supply Project Water Activity Enterprise (District)." *Id.* The Participants were identified as a group of towns and rural water districts. *Id.* The Corps asserted that "[t]he Project will provide approximately 37,000 acre-feet of new reliable water supply, which will meet a portion of the Participants' estimated 2025 additional water supply needs." *Id.*

56.    The Corps asserted that "[m]ost of the Participants predominantly rely on Colorado-Big Thompson (C–BT) units to meet their growing water supply needs. The Participants recognize that there is a finite amount of C–BT units remaining in the market and that a collaborative effort to secure additional firm water supplies is preferable to each entity independently developing a new water supply." *Id.* at 51,641.

57.     At the time of scoping, the preferred configuration of NISP was described as follows: "[i]t would include a proposed Glade Reservoir with a capacity of approximately 177,000 acre-feet. Associated with Glade Reservoir are a forebay, pump station, and canal upgrade to convey water diverted from the Cache la Poudre River to the proposed reservoir." *Id.* The Glade project also proposed a new "pipeline connecting the proposed Glade Reservoir to the existing Horsetooth Reservoir," as well as the rerouting of a section of U.S. Highway 287 and a section of the North Poudre Supply Canal. *Id.* In addition to this new Glade Reservoir, "[t]he proposed Project also would include a proposed Galeton Reservoir with a capacity of approximately 30,000 acre-feet," along with "a forebay, pump station, and pipeline to deliver South Platte River water to Galeton Reservoir," as well as proposed "[w]ater exchanges between the Galeton Reservoir and Glade Reservoir diversion locations." *Id.*

58.     The Corps stated that NISP would be a "non-Federal project constructed, owned, and operated by the District," but would require a Section 404 Permit under the Clean Water Act because it was "expected to result in temporary and permanent impacts to jurisdictional waters of the United States." *Id.*

59.     During the scoping period, the Corps received dozens of written comments as well as many oral comments during public hearings, through which they identified 13 categories of significant issues for future study. *See* Scoping Report at iii. The chief concerns identified as significant issues to be considered in the EIS included, among others, impacts to surface water flow and water quality, wildlife, fish and aquatic life, wetlands and riparian resources, as well as recreation resources. *Id.* at 20-21.

**D.    2008 Draft EIS**

60.    In April 2008, the Corps published its Draft EIS ("DEIS") and solicited public comment on the analysis. *See* 73 Fed. Reg. 23,437.

61.    The Federal Register notice included an updated description of NISP as a "regional water supply project intended to provide approximately 40,000 acre-feet (AF) of new water for 12 water providers and municipalities in Larimer, Weld, Morgan and Boulder Counties." *Id.* at 23,437-38.

62.    In the DEIS, the Corps again defined the purpose and need of the project as follows: "[t]he purpose of NISP is to provide the Participants with approximately 40,000 AF of new reliable municipal water supply annually through a regional project coordinated by the District." DEIS at ES-2.

63.    Regarding the projected water demand, the Corps asserted that "[b]y the year 2025, the projected demand is 90,700 AF. The NISP Participants have requested 40,000 AF in combined new firm yield from NISP." DEIS at ES-4. The Corps explained that "NISP will supply a portion of the Participants' future water supply needs, but will not fully meet the Participants' estimated future water supply needs" and further asserted that "[b]ecause all of the Participants face water shortages that would only partly be met by the new firm yield they have requested from NISP, it is likely that all of the Participants would pursue additional water sources no matter if NISP is implemented." DEIS at ES-7; *see also id.* at 1-44 (discussion of possible pursuit of other water supply projects in addition to NISP, as NISP will only supply a portion of future needs).

64.     The DEIS made clear that NISP was never intended to meet all of the Participants' water needs: "[t]he requests for new firm yield are based on the Participants' analyses of their projected needs, the potential future demands as modeled by the District and scrutinized by the Corps, plus a 10 percent safety factor to account for uncertainty about future demand (Harvey Economics 2006; HDR 2007a)." DEIS at 1-5. By way of explaining the origin of the 40,000 AF figure itself, the Corps stated that this amount was far less than the actual projected need and was simply a number arrived at by compromise: "[t]he Participants are requesting 40,000 AF of new firm yield from NISP even though their combined shortage in 2025 is 41,120 AF, and their combined shortage in 2050 is estimated to be 70,020 AF. The requested firm yield is a blend of affordability and need." DEIS at 1-6. Northern explained that even though its projected water needs were "1.75 times greater than the requested firm yield from NISP, the Participants are not requesting their entire future estimated shortage from NISP because most Participants anticipate that it would be too costly to seek the amount that would fully cover projected shortages." *Id*. In other words, because NISP was never designed to meet the full projected water shortage, there was inherent flexibility in designing a project to meet a portion of this larger need.

65.     In conducting the alternatives analyses required by both NEPA and the CWA, the Corps opted to integrate both NEPA purpose and need requirements and the 404(b)(1) Guidelines into a single alternatives analysis. *See* DEIS at 2-3. Project concepts and elements were screened first for NEPA purpose and need (comprised of three separate criteria), second for environmental impact, and third for practicability to arrive at a single set of retained alternatives. DEIS at ES-3, 2-3. The Corps explained that "[i]ntegration of both NEPA and 404(b)(1)

guidelines ensures that the alternatives selected for evaluation in the EIS provide a reasonable range of alternatives and that the alternatives are practical." DEIS at ES-3.

66.    For NEPA purpose and need screening, the DEIS required the following three criteria based directly on NISP's stated purpose and need: "firm yield, timeliness, and regional project." DEIS at 2-5.

67.    First, as to firm yield, the DEIS stated: "[t]he firm yield screening criterion requires that viable water supply sources must be capable of providing a firm annual water yield. This screening criterion was only applied to concepts because concepts are defined as a source of potential water supplies able to meet a portion of the NISP Participants' request." DEIS at 2-5. The Corps explained that in order to pass the "firm yield" criterion, "concepts must be able to provide at least 30 percent of the total requested firm annual yield of 40,000 AF, which is 12,000 AF. Limiting the provisional percentages reduces the number of water supply sources to a maximum of four, which is logistically reasonable for a regional water supply project of this magnitude." *Id.*

68.    Regarding the second criterion, timeliness, the DEIS stated: "[t]he majority of NISP Participants have an immediate need for water because between 2005 and 2010, the total demand of all the Participants combined will exceed their combined firm annual yield, as described in Table 1-10 in Chapter 1. This screening criterion is reflected in the NISP purpose and need statement as 'current and reasonably projected future additional water supply needs.' Elements, concepts, or alternatives that could be held in extensive litigation or by other timeliness issues were eliminated." DEIS at 2-5.

69.     Lastly, the Corps used the "regional project" language from the purpose and need statement to screen out any projects not regional in nature, as follows: "NISP is a regional water supply project addressing a portion of the current and anticipated water supply needs of 12 Participants providing water to an area of about 945 square miles. Concepts, elements, and alternatives that would not assist in providing the Participants with a common solution were eliminated from further review." DEIS at 2-5.

70.     Following this first level of NEPA screening, the Corps next screened for both environmental impact and practicability in order to identify the least environmentally damaging practical alternative in accordance with the CWA 404(b)(1) Guidelines. *See* DEIS at 2-5-2-8; 40 C.F.R. § 230.10(a). To assess environmental impact, the DEIS looked at impacts to wetlands and waterways: "[t]hese screens were applied solely to elements. This level of environmental analysis allows for the elimination of those elements that result in the largest and most extensive direct environmental impacts in accordance with 40 CFR 230.10(a)." DEIS at 2-5. Specifically, elements that passed the wetlands screen "did not cause permanent, direct loss to 60 acres or more of wetlands" and "any new proposed reservoir element located on a perennial stream was eliminated from further evaluation." *Id.* Lastly, the Corps screened for several criteria it identified as related to practicability including "logistics" and "existing technology," wherein the "logistics criterion was divided into screens for land use, element capacity, and elements that are integral to the development plans of others." *Id.* at 2-6-2-8. For example, the Corps defined an element "as a storage facility capable of containing a portion of the 40,000 AF" annual supply needed for NISP. DEIS at 2-18. And in order to limit the number of elements to a manageable number, the Corps further required that "elements must have a storage capacity of 25,000 AF or

greater," in order to result in a maximum of six potential storage elements in any one alternative to meet the total project storage requirement of 160,000 AF. DEIS at 2-7. The total storage figure of 160,000 AF was based on the Corps' assumption of a 4:1 storage-to-yield ratio, whereby NISP must store a total of 160,000 AF in order to obtain the 40,000 AF annual supply. DEIS at 2-18.

71.     With the above three-step NISP screening criteria in place (purpose and need, environmental impact, and practicability), the Corps began its alternatives analysis by applying the criteria to the set of 16 original concepts. The Corps had defined a project concept as "a source of potential water supplies able to meet a substantial portion of the NISP Participants' requests. Concepts included general strategies or classes of potential structural or nonstructural solutions (e.g., storage in the Cache la Poudre River Basin (Poudre Basin) foothills or dry-year leases) that could be incorporated into comprehensive alternatives for meeting NISP objectives." DEIS at 2-3. As a result of this screening process only three "concepts"—water rights development, South Platte Water Conservation District, and agriculture to municipal transfers— were retained. *Id.* at 2-8. All other concepts, including agricultural water conservation, shorter-term leases, temporary dry-year transfers (also known as dry-year leases), and conservation by the Participants, were eliminated. *See* DEIS at 2-4, 2-11-2-18.

72.     Next, the Corps applied the NISP screening criteria to the 215 potential elements—an element was defined as "a storage facility capable of containing a portion of the 40,000 AF of new reliable municipal water supply that would be required annually for NISP." DEIS at 2-18. The list of elements included reservoir rehabilitation, reservoir enlargement, new reservoir, ground water, and gravel lakes. *Id.* After application of the NISP screening criteria, the

only elements that survived was a list of 11 potential new reservoirs. *Id.* In other words, the Corps eliminated at this stage of the analysis all non-new reservoir elements, in isolation or in combination.

73.     As a final step, "[t]he three retained concepts and retained best fit elements were then combined to develop a reasonable range of alternatives." *Id.* at 2-18. In the end, only 4 alternatives were retained for detailed study: (1) the No Action alternative in which "Participants would develop independent water supplies by purchasing water rights and pursuing independent storage and conveyance systems in the absence of NISP"; (2) Alternative 2, the Participants' Proposed Action consisting of construction of  a new Glade Reservoir (capacity of 170,000 AF) along with construction of the South Platte Water Conservation Project (SPWCP), which included a new 40,000 AF Galeton Reservoir; (3) Alternative 3, consisting of construction of a new Cactus Hill Reservoir (capacity 180,000 AF) along with construction of the SPWCP, which included a new 40,000 AF Galeton Reservoir; and (4) Alternative 4, an alternative very similar to the Proposed Action, but incorporating construction of *either* "Glade Reservoir (170,000 AF) or a Cactus Hill Reservoir (180,000 AF) subalternative and SPWCP, which included a (slightly smaller) 20,000 AF Galeton Reservoir, with the transfer of agricultural water rights for 12,000 AF of firm yield." DEIS at ES-3; *see also* DEIS at 2-20-2-34 (detailed discussion). Thus, every action alternative carried forward incorporated the construction two new large reservoirs.

74.     In its preferred alternative, Alternative 2, Northern Water proposed to "construct Glade Reservoir with a total storage capacity of approximately 170,000 AF" as well as "construct the [South Platte Water Conservation Project or SPWCP] which includes Galeton Reservoir with a total storage capacity of approximately 40,000 AF and support facilities." *See*

73 Fed. Reg. at 23,438. In addition to the construction of the two new reservoirs themselves, "an existing diversion dam and intake structure in the Cache la Poudre River would be rehabilitated and a forebay, pumping facility and outlet channel would be constructed," a 7-mile section of U.S. highway 287 and a section of the Munroe (North Poudre Supply) Canal would both have to be rerouted. *Id.* Finally, "[a] new diversion dam and intake in the South Platte River, pumping facilities, and new pipelines would also be constructed with Galeton Reservoir for the SPWCP." *Id.*; *see also* DEIS at ES-1 (describing proposed action).

75.    As the DEIS itself described, the differences between the preferred Alternative 2 and the others were minimal: "Alternative 3 is similar to the Proposed Action except that water diverted from the Poudre River would be stored in the proposed Cactus Hill Reservoir instead of the proposed Glade Reservoir." DEIS at ES-4. In addition to a slightly larger capacity, Cactus Hill additionally "would necessitate realignment of three Weld County Roads and two power lines." *Id.*

76.    Likewise, the DEIS explained that Alternative 4 was also similar. It "would utilize either Glade Reservoir or Cactus Hill Reservoir; therefore, Alternative 4 is similar to the Proposed Action or Alternative 3 except that about 12,000 AF of the Participants' requested yield would come from the purchase and transfer of agricultural water rights to municipal and industrial (M&I) use. This alternative likely would reduce the amount of water that would need to be diverted from the South Platte River through the SPWCP when compared to the Proposed Action and Alternative 3." DEIS at ES-4. As such, Alternative 4 would still entail one large new reservoir (either Glade or Cactus Hill), but a slightly smaller Galeton Reservoir reflecting the contribution of the transferred water: "[t]he size of the proposed Glade Reservoir under

Alternative 4 would be 170,000 AF (the same size as under the Proposed Action), Cactus Hill Reservoir would be 180,000 AF (the same as Alternative 3), and Galeton Reservoir would be constructed to store 20,000 AF of water." *Id.*

77.     The DEIS also noted that while there are some differences in impacts to environmental resources, "all of the NISP alternatives would have significant environmental effects" and "[m]any of the environmental effects are common to the alternatives." DEIS at ES-5. While Alternative 1 (No Action) "would rely primarily on the conversion of agricultural water rights to [municipal and industrial] use to provide the firm yield to the Participants," Alternatives 2, 3, and 4 "would rely on the District's Grey Mountain and SPWCP water rights and, therefore, have similar effects on streamflows of the Poudre and South Platte rivers." *Id.* The Corps summarized that "[a]ll of the action alternatives would affect flows in the Poudre River in two ways: first, water would be diverted from the Poudre River when the District's Grey Mountain water right is in priority," and second, "all of the action alternatives have the SPWCP as a component that involves an exchange of water diverted from the South Platte River for water diverted from the Poudre River," which would "reduce existing flows in about 23 miles of the Poudre River." *Id.* at ES-5-ES-6.

78.     In addition, the Corps stated that "[t]he effects of reduced streamflows distinguish Alternative 2 and the other action alternatives (Alternatives 3 and 4) from the No Action alternative; however, these effects for the most part, are not useful in determining the differences *among* the action alternatives." DEIS at ES-7 (emphasis added). Instead, distinctions among the environmental impacts of the action alternatives involve primarily number of acres of wetlands lost (44 acres for Alternative 2 compared to 79 acres for Alternative 3); loss of vegetation (3,942

acres for Alternative 2 compared to 6,237 acres for Alternative 3), as well as relatively small differences in potential road realignment and estimated project costs. *Id.* at ES-7-ES-9.

### E.    Comments on DEIS

79.    The Corps received approximately 675 comments on the DEIS from the public and federal and state agencies, including EPA and Petitioner. *See* SDEIS at S-1.

80.    EPA expressed a number of concerns related to water quality and flow analysis, namely that "EPA is concerned that once [water quality impacts] are completed, the results are likely to show that the project has the potential to cause significant impacts to Colorado's natural resources, including impacts to the impaired waters of the Cache la Poudre River . . . EPA also believes that the impacts to the Poudre River and the South Platte River from changes in stream morphology due to significantly reduced flows in the river may be more severe than discussed in the DEIS." EPA Region 8, Letter to Colonel David. C. Press (Sept. 22, 2008) (hereinafter "EPA DEIS Comment Letter") at 2.

81.    In addition, EPA expressed its belief that "the DEIS unnecessarily constrained the alternatives analysis by applying screening criteria (e.g. firm yield, regional project, and timeliness) which may have led to the exclusion of other potentially less environmentally damaging practicable alternatives." EPA DEIS Comment Letter at 9. EPA emphasized that the agency "has raised the concern regarding screening criteria with the Corps at numerous pre-application meetings." *Id.*

82.    Specifically, as to the firm yield criterion, EPA was concerned that using historical water use factors to calculate projected need "would tend to overestimate future demand" and thus "[b]ecause all subsequent screening criteria were based upon the 40,000 AF,

potential overestimation of this need could have eliminated viable alternatives." *Id.* The EPA expressed particular concern with the requirement that "firm yield" alternatives must have at least 30% of 40,000 AF (i.e., 12,000 AF), to pass the screening criterion. EPA DEIS Comment Letter at 9-10. Despite the DEIS reasoning that this cutoff would ensure "a logistically reasonable number of alternatives," EPA stated that the "value of 30% appears arbitrary" and asked for the rationale in selecting this figure. *Id.*

83.    EPA further explained that the DEIS interpreted the term "regional project" from the purpose and need statement to screen alternatives in a manner that was unnecessarily narrow and restrictive: "EPA believes the language used in the Purpose and Need statement describing 'regional project' coordinated by the District does not necessarily imply a single storage project as a common solution (as inferred in the DEIS page 2-5) but may also suggest that it could be a cooperative water planning effort to maximize water supply efficiency. The term 'regional project' as used in the DEIS has the effect of eliminating several alternatives because the alternatives did not meet the project's stated purpose and need." EPA DEIS Comment Letter at 10.

84.    EPA also expressed criticism of the timeliness criteria: "[w]hile the EPA understands the importance of this issue to the region, the DEIS also states that Participants will likely seek temporary measures to address shortages (i.e. short-term leases). The ability to assess these measures should be considered when examining alternatives. Such timeliness factors should not render an alternative impracticable and delays are generally not an appropriate basis for screening alternatives." EPA DEIS Comment Letter at 10.

85.     In light of these concerns about the screening criteria applied in the DEIS, EPA stated that it "believes the DEIS does not support the Proposed Action as the least environmentally damaging practicable alternative (LEDPA). EPA is concerned that alternatives exist that would have less adverse impacts to the aquatic environment, specifically alternatives which include agricultural-municipal leases and long-term transfers, and conservation." EPA DEIS Comment Letter at 10. Specifically, "[i]f short term leases are used by Participants for water supplies, even if as a temporary measure, it appears that leases reflect a practicable alternative for water supplies under the Guidelines. The applicant needs to clearly demonstrate why short term leases and other agricultural to municipal use options that could allow for the preservation of agriculture are not practicable." *Id.* EPA also urged that "conservation efforts should be more fully considered" and that the DEIS failed to "document how [conservation] has been factored into decreasing the demand for NISP" despite the DEIS representing it had done so. *Id.*

86.     Finally, EPA expressed that the agency "believes that a combination of alternatives could serve to meet a portion of the defined need and may potentially be less damaging than the alternatives analyzed in the DEIS." *Id.* Specifically, "conservation (i.e. supply and demand conservation, including agricultural conservation) and alternative agricultural to municipal transfers could, in turn, meet the proposed need and be less environmentally damaging than the alternatives analyzed." *Id.* In particular, "by first identifying the role of conservation in meeting a portion of overall project need, this will reduce total project supply need figures and re-establish the viability of previously discarded alternatives eliminated in the screening process." *Id.*

87.    The City of Fort Collins also mounted strong opposition to the project from the beginning—with the City Council adopting a resolution on September 2, 2008 stating that it opposed "any variant of NISP that does not address the City's fundamental concerns about the quality of its water supply and the effects on the Cache la Poudre River through the City, which are critical to the City's quality of life, health, economic development and environment." Specifically, Fort Collins expressed in lengthy and technically detailed comments accompanying the resolution that the city had grave concerns about degradation of water quality in the Poudre River requiring the city to implement additional expensive water treatment systems; detrimental impacts on the riparian vegetation, aquatic habitat, and aquatic and terrestrial wildlife in the river corridor as it passes through Fort Collins; and the impacts of reduced river flows on recreation along the river, among many others. The City noted that, not only did the DEIS fail to meaningfully develop or evaluate these detrimental of impacts from NISP, but the mitigation concepts set forth were also not sufficiently analyzed and "fail[ed] to offer any mitigation measures at all for several of the City's concerns." Fort Collins DEIS Comment Letter, Exhibit A at 2.

88.    In addition, other commenters—including Petitioner and partner organizations—also submitted comments raising concerns, among many others, about the NISP screening criteria being used to artificially constrain the alternatives analysis resulting in three very similar action alternatives—each of which include multiple large new reservoirs.  STP Comment Letter (Sept. 12, 2008) at 8-9.

89.    At that time, Petitioner also submitted the "Healthy Rivers Alternative" ("HRA") proposal to the Corps, as an alternative means to meet NISP's purpose and need. The HRA

proposed a lower need of 35,000 AF (i.e., nearly 88% of the purported water supply "need" for NISP identified by Northern Water) based on Petitioner's own independent analysis of future water demands and proposed that this need could be met through a combination of agricultural water concepts including rotational fallowing, use of Colorado-Big Thompson units, traditional agricultural transfers, and development displaced water. *See* SDEIS at S-18.

### F.    2015 Supplemental Draft EIS

90.    In June 2015—over seven years after publishing the DEIS—the Corps published its Supplemental Draft EIS ("SDEIS") and again solicited public comment. *See* 80 Fed. Reg. 35,322.

91.    The SDEIS was intended to address concerns about the lack of environmental impact analysis and mitigation in the earlier DEIS: "After receiving comments on the Draft EIS during the public notice period and during the public hearings, the Corps determined that substantial additional analysis was needed and that the preparation of a Supplemental Draft EIS was required." 80 Fed. Reg. 35,322.

92.    The SDEIS updated the mitigation plan and incorporated additional studies including an updated analysis of water needs through 2060, as well as studies addressing hydrology, aquatic habitat impacts, stream morphology and sediment transport, water quality, hazardous materials, wetlands impacts, and other topics. *See* SDEIS at S-2-S-5.

93.    Separate from the project purpose and need statement for NEPA, the Corps also identified NISP's "basic project purpose" in order to determine whether the project was water-dependent for purposes of the 404(b)(1) Guidelines. The Corps established that the "basic project purpose for the NISP is to provide water" and that "[b]ecause supplying water . . . does not

fundamentally require access or proximity to, or siting within, a special aquatic site to meet this basic project purpose," NISP was not "water dependent." SDEIS at S-15-S-16. The Corps further noted that, per the 404(b)(1) Guidelines, where a project is not water dependent: "practicable alternatives (1) are presumed to exist and (2) that do not involve a discharge into a special aquatic site are presumed to be less environmentally damaging than the Preferred Alternative, unless clearly demonstrated otherwise" and confirmed that these rebuttable presumptions apply to the NISP Section 404 Permit application. *Id.*

94.     Rather than utilize this basic project purpose for its NEPA analysis, the SDEIS turned back to the same, more constrained, purpose and need statement used in the DEIS to conduct its alternatives analysis, namely: "To provide the Project Participants with approximately 40,000 acre-feet of new reliable municipal water supply annually through a regional project coordinated by the District, which will meet a portion of the Participants' current and reasonably projected future additional water supply needs." SDEIS at S-15.

95.     The Corps also explained that the origin of the 40,000 AF "need" came from the Participants themselves: "[t]he Participants are requesting 40,000 AF of new firm yield from NISP (Table 1-1). The requests for new firm yield are based on the Participants' analyses of their projected needs, the potential future demands as modeled by the District and verified by the Corps, plus a 10% safety factor to account for uncertainty about future demand (see Section 1.1.8.2)." SDEIS at 1-5.

96.     Along with keeping this narrow purpose and need—and notwithstanding the serious concerns raised by EPA, Petitioner, and others—the SDEIS also retained two of the most restrictive NEPA purpose and need based screening criteria: the "firm yield" criterion requiring

40,000 AF (and a minimum of 12,000 AF per supply project) as well as the "regional project" criterion. *See* SDEIS at 2-3. Justifying the latter criterion, the Corps stated that "[t]he District is a regional water supply entity with responsibilities for water supply planning and management for the region and what it is proposing is a regional water supply project to meet the water supply needs of 15 Participants providing water to an area of about 945 square miles." SDEIS at 2-3.

97.     Only the timeliness criterion was eliminated. The project concepts that had been eliminated earlier based on timeliness were brought back and reevaluated, but all were again eliminated for other reasons. *See* SDEIS at 2-3, 2-4-2-6.

98.     Other than this one change—which did not result in any new retained concepts— the Corps incorporated the same screening results from the DEIS, which, in terms of large reservoirs constructed, were also effectively the same as the analysis from 2007. Thus, once again, the original list of 16 potential concepts was whittled down to three concepts—water rights development, South Platte Water Conservation Project, and agriculture to municipal transfers. SDEIS at 2-4. And the original list of 215 elements was narrowed to just 11 elements—all new reservoirs. SDEIS at 2-6. The Corps did nothing to broaden the list of potential concepts or elements and instead focused only on new reservoirs: "[t]he Corps did not identify any new concepts or elements during the 2014 alternatives re-evaluation and concluded the "best fit" evaluation performed in 2007 was still valid. The best fit evaluated equivalent elements from the 2007 short list of elements to avoid redundancy among equivalent elements. Equivalent elements were new reservoir sites similar in capacity, general location, and river basin." SDEIS at 2-7.

99.     In the end, "[t]he three retained concepts and retained best fit elements identified in 2007 were then combined to develop a reasonable range of alternatives. The alternatives developed for evaluation in the SDEIS reflect the combined retained concepts and elements (Table 2-1)." SDEIS at 2-7; *see also* SDEIS Table 2-2 at 2-16 (listing four alternatives and the elements and concepts to which they relate).

100.     At the same time, the Corps explained why these screening criteria also eliminated the Healthy Rivers Alternative offered by Petitioner from further study. Because the HRA only proposed to meet a demand of 35,000, AF it was automatically eliminated for failure to meet the "NISP need of 40,000 AFY." SDEIS at 2-9. In addition, all but one of the individual concepts underlying HRA were each discussed and screened out as well. HRA was based on four agricultural water transfer concepts including rotational fallowing, use of Colorado-Big Thompson units, traditional agricultural transfers, and development displaced water. Rotational fallowing was eliminated for failure to meet the proven technology and firm yield screening criteria. SDEIS at 2-10. Specifically, the Corps explained that "NISP firm yield criterion *could* be met if NISP were able to acquire ownership of the water rights, but would fail the firm yield criterion if ownership was left with the agricultural users because the perpetuity of the supply would last only as long as the initial lease," and therefore the concept must be screened out entirely. *Id.* Acquisition of C-BT units also failed the firm yield criterion, because although "likely that NISP Participants would be able to continue to acquire smaller amounts of C-BT to augment their overall supply portfolio," the Corps felt it was too speculative that they would be able to meet the 12,000 AF firm yield screen for individual water sources. *Id.* at 2-10, 2-11. The Corps explained that traditional agricultural transfers were already part of the No Action

alternative and therefore the concept "as proposed in the Healthy Rivers Alternative does not differ fundamentally from the Corps' previous analyses." *Id.* at 2-11. And lastly, the Corps stated that "[a]cquisition of development displaced water by individual Participants does not constitute a regional project and therefore fails the regional project criterion." *Id.* at 2-12.

101.    Having eliminated the alternatives submitted by Petitioner, the Corps returned to the four alternatives that it had carried forward from the DEIS, with only minor changes to the three action alternatives. The Corps updated the No Action alternative to reflect a 120,000 AF Cactus Hill Reservoir, after the Participants determined that the No Action alternative in the DEIS "was not feasible." SDEIS at S-1. The No Action alternative was designed to reflect "what the Participants would do to meet their need of 40,000 AFY of new firm yield if the Corps did not issue a Section 404 Permit to the District for construction of NISP." SDEIS at 2-16. Specifically, "[i]n 2010, the Participants identified a new No Action Alternative (MWH 2010) for the SDEIS that assumes the Participants would collectively pursue a regional project, independent of the District, in the event of a permit denial for the proposed NISP. The No Action Alternative presented in the SDEIS would deliver water to the Participants by transferring agricultural water supplies from the Poudre River and Big Thompson River Basins, using a pro rata amount of existing storage in those systems, and constructing a new reservoir at the Cactus Hill Reservoir site." *Id.* at S-21.

102.    Alternative 2, the preferred alternative, would still incorporate the construction of the Glade Reservoir (capacity of 170,000 AF) and the SPWCP, including the new Galeton Reservoir with a slightly increased capacity over that outlined in the DEIS of 45,624 AF. SDEIS at S-21-S-22, S-28. Note that "[t]he size of Galeton reservoir, which is part of the SPWCP and

all of the action alternatives, was increased from 40,000 AF in the DEIS to 45,624 AF in the SDEIS to maximize beneficial use of 1992-priority storage rights." SDEIS at 2-1. In addition, of the action alternatives, only Alternative 2 would allow for winter flow augmentation, specifically: "[a]ugmenting flows in the Poudre River by releases from a designated 3,600-AF pool in Glade Reservoir with a target of maintaining a 10-cfs flow below the Larimer-Weld Canal headgate in November 1 through April 30 and September 1 through September 30." SDEIS at S-21.

103.    Both Alternatives 3 and 4 included the construction of the Cactus Hill Reservoir with a capacity of 190,000 AF and, like Alternative 2, also included construction of the SPWCP with the new Galeton Reservoir with a capacity of 45,624 AF. The Corps explained in the SDEIS that the principal difference between the alternatives was that: "Alternative 3 is similar to the District's Preferred Alternative (Alternative 2) except that water diverted from the Poudre River would be stored in the proposed Cactus Hill Reservoir instead of the proposed Glade Reservoir." SDEIS at S-24. Likewise, Alternative 4 was also very like Alternative 3 with the only difference between these two action alternatives being the location of the diversion. *See id.* Table S-3 at S-23. As a result of the different diversion location, "Alternative 4 would allow more water to remain in the Poudre River between the Poudre Valley Canal and the New Cache Canal before it was diverted for exchanges." *Id.* at S-24.

104.    Thus, despite ostensibly starting with a wide array of concepts and elements, the alternatives analysis was yet again reduced to a set of large new reservoirs with only minor differences between the action alternatives. Every action alternative carried forward in the SDEIS incorporated the construction of two new reservoirs and the principal differences between

the 3 action alternatives lay only in the siting of the largest reservoir, the location of the water diversion (which would in turn affect streamflows in the Poudre River), the specific roads to be relocated, and whether winter flow augmentation was available (only for Alternative 2). SDEIS Table S-3 at S-23.

### G.    Comments on the SDEIS

105.    In its comments to the Corps on the SDEIS, EPA recognized the substantial volume of work that went into the SDEIS and noted that "[o]verall, the SDEIS reflects a significant amount of work and includes an array of revised resource impact analyses, including many topics raised in EPA's comments." EPA SDEIS Comment Letter (Sept. 3, 2015) at 1. Notwithstanding these efforts in some areas, EPA also reiterated many of its concerns about the overly constrained alternatives analysis, along with numerous other concerns about environmental impacts and mitigation.

106.    With regard to the alternatives analysis in particular, EPA remained concerned that it was too narrow and as such, "analysis regarding the availability of potentially less damaging alternatives appears constrained by the narrow project purpose." EPA SDEIS Comment Letter at 4. In the end, EPA rated all action alternatives "Environment Objections – Insufficient Information" ("EO-2"). *Id.* at 5.

107.    One result of this narrow purpose and need, as discussed above, was that there was very little variability among the alternatives with regard to environmental impacts. Notably, EPA itself observed in its comments that "[t]he SDEIS predicts similar effects for all three action alternatives for hydrology, water quality, stream morphology and wetlands. Some alternatives appear to offer certain environmental advantages or disadvantages at various locations or times

over others, though *on balance the EPA does not identify a major environmental impact difference among the action alternatives*." EPA SDEIS Comment Letter at 3 (emphasis added).

108.    In its accompanying detailed comments on SDEIS, EPA elaborated on the flaws in the SDEIS's alternatives analysis: "[w]e remain concerned that the selected screening criteria and a narrow purpose and need statement in the SDEIS appear to constrain the alternatives available to meet demand. These constraints may result in exclusion of potentially less damaging practicable alternatives, which would need to be considered under the Clean Water Act (CWA) Section 404(b)(1) Guidelines." EPA Detailed Comments on SDEIS at 9. Rather than the more constrained project purpose in the SDEIS, EPA suggested that the Corps use the "basic project purpose" to provide water as "an appropriate basic purpose and need statement for Clean Water Act permitting for this type of project." *Id.*

109.    EPA also directly objected the screening criteria used, specifically the regional project criterion, the minimum element storage capacity of 25,000 AF, the minimum firm yield of 12,000 AF for water sources, and what EPA observed to be—in effect—a perpetual ownership requirement by the District. "We are concerned that these criteria may limit consideration of alternatives that could potentially provide a portion of long-term water supply with less impact than the alternatives that were analyzed." EPA Detailed Comments on SDEIS at 9.

110.    EPA explained its objection to the regional project criterion as follows: "[w]hile regional water supply projects are an important option to consider when meeting water demand, regional projects, especially when they involve new reservoirs, are not necessarily the least environmentally damaging means to meet the basic project purpose. A regional project coordinated by the District could incorporate a cooperative water planning effort to maximize

water supply efficiency. *The particular regional project criterion used for NISP constrains the alternatives available*." (emphasis added).

111.     In addition, EPA noted that "[t]he SDEIS appears to implement the firm yield criterion as a two-pronged requirement for both a firm yield of 12,000 acre-feet-per-year per water source and perpetual ownership by Northern. . . . It is not clear why ownership in perpetuity is necessary to meet the project purpose. Northern is a regional water supply entity that engages in many water transactions to supply its constituents with water and not all transactions are contingent upon Northern's outright ownership of a water right. It seems reasonable that Northern could manage water sources . . . in ways that could supply the participants with consistent firm yield without perpetual ownership." EPA Detailed Comments on SDEIS at 10. EPA explained that both the volume and perpetual ownership requirements incorporated into the firm yield criterion seemed to represent a change from the original firm yield criterion in the Corps' 2007 HDR NISP Alternatives Evaluation Report Volume II, which stated only that "[t]he firm yield criterion simply requires that viable water supply sources must be capable of providing a fixed (firm) amount of water yield for every unit of time. For NISP, this means water must be provided in sufficient amounts on an annual basis to satisfy current and projected demands" *Id.* (citing Corps' 2007 Alternatives Evaluation Report Volume II). The EPA noted that in the Corps' 2007 alternatives analysis, "[n]either a volume nor perpetual ownership were specified. It is not clear to us why this more inclusive screening criterion was not carried forward." *Id.*

112.     In its comments on the SDEIS, the City of Fort Collins once again submitted a lengthy and technical comment letter opposing NISP and detailing the ways in which the SDEIS

failed to either adequately or accurately assess environmental impacts, including, among others: degradation of water quality; alterations to stream morphology and sediment transport impacting the river's channel structure, storm water issues, and flood risks; as well as substantial impacts to riparian areas, wetlands, aquatic life and habitat, and terrestrial wildlife. "In short, the SDEIS remains inadequate for the Corps to discharge its obligations under these requirements, including its selection of the least environmental[ly] damaging practicable alternative ("LEDPA") for the Project." Fort Collins SDEIS Comment Letter at 7. Further, "[t]he adequacy of the cumulative effects and mitigation planning cannot be evaluated without better analysis of the critical factors" pertaining to the city's biological resources. *Id.* at 106.

113.    In addition to highlighting the Corps' deficient analysis, the City offered its own specific alternative—a modified Alternative 4—which it stated "would meet the NISP Participant's purpose and need while simultaneously maintaining relatively more water in the Poudre River through Fort Collins than all other action alternatives presented in the SDEIS." Fort Collins SDEIS Comment Letter at 20. The alternative proposed by Fort Collins was designed to track the Corps' Alternative 4, but with significantly reduced upstream diversions "as compared to Alternative 2 (the District's preferred action), as well as Alternatives 3 and 4, resulting in relatively more stream flows and relatively fewer impacts to aquatic and riparian resources along a 23 mile reach of river through Fort Collins than the other action alternatives considered in the SDEIS." *Id.* The three principal differences in the City's modified Alternative 4 were: "(1) expansion and lining of the Poudre Valley Canal would not be needed nor occur; (2) pump stations from the New Cache Canal and Big Windsor Reservoir to Cactus Hill Reservoir

would be expanded, and (3) an advanced water treatment plant, as formulated for the No Action Alternative, may be needed." *Id.* at 21.

114.    According to the City, these "additional flows through Fort Collins would address many of the concerns addressed in these comments." *Id.* at 20. And because the alternative would entail "costs comparable with other alternatives and would also result in fewer wetlands impacts than all other alternatives described in the SDEIS," the city asserted that its modified Alternative 4 "is a practicable alternative with fewer environmentally damaging impacts than those alternatives considered in SDEIS, and consequently should be evaluated by the Corps in its NEPA and CWA Section 404 analysis." *Id.*

115.    Having already submitted its own alternative for consideration to the Corps in 2008—the HRA, which the Corps summarily eliminated in the SDEIS under its rigid screening criteria—in its comments on the SDEIS, Petitioner repeated its concerns about the Corps' practice of employing the narrow purpose and need statement and the rigid "regional project" and "firm yield" screening criteria to dispense with all less damaging alternatives and move forward with two large new reservoirs. As to the regional project criterion, Petitioner objected that "[t]he Corps, in deferring to the project proponent's desires, fails to demonstrate why multiple small projects operated or coordinated by the project proponent and serving the participants in a regionally coordinated fashion does not constitute a 'regional project.'" Save the Poudre SDEIS Comment Letter (Sept. 3, 2015) at 6.

116.    Similarly, Petitioner objected to the rigid application to the 40,000 AF firm yield criterion: "[t]he Corps' analyses project the 'need' that the proponent and participants seek to meet with NISP as 84,000 acre-feet. The Corps fails to provide any support for its use of the

lesser 40,000 acre-feet figure other than that was the amount that the application requested. SDEIS at Table 1-1." *Id.* at 7. As such, Petitioner argued that "by applying the 40,000 acre-feet figure, a value that was chosen arbitrarily and capriciously from a range of possible values that would have been equally valid in partially meeting what the SDEIS purports to document as the need of the participants," the Corps unduly constrained the alternatives analysis. *Id.*

**H.     2018 Final EIS**

117.     In July 2018—roughly 14 years from the initial scoping and three years from the publication of the SDEIS—the Corps issued its FEIS, the final NEPA review document for this project. Despite the passage of so much time, the action alternatives considered and the preferred project alternative evolved only slightly.

118.     The preferred alternative essentially mirrored the approach that Northern Water originally proposed. Namely, "[i]n 2004, Northern Water completed its Phase II Alternative Evaluation Report for NISP (Phase II report) (MWH 2004). The objective of the Phase II report was to identify a preferred configuration for NISP that would provide adequate new firm yield for the Participants. . . . The Phase II report (MWH 2004) identified a preferred project as having a new Glade Reservoir as storage for the Grey Mountain water rights and a new Galeton Reservoir as storage for the SPWCP water rights." At FEIS at 1-5. In the end, the preferred action in the FEIS, Alternative 2M, likewise consists of a 170,000 AF Glade Reservoir and the SPWCP, with a new Galeton Reservoir. *See* FEIS at 2-53.

119.     Despite years of consistent objections from EPA and Petitioner, among others, in conducting its final alternatives analysis, the Corps carried forward the same purpose and need statement, which reads as follows: "To provide the Project Participants with approximately

40,000 acre-feet of new reliable municipal water supply annually through a regional project coordinated by the District, which will meet a portion of the Participants' current and reasonably projected future additional water supply needs." FEIS at 1-7.

120.    In explaining the origin of the 40,000 AF figure, the FEIS confirmed that the "approximately 40,000" acre-feet the Participants claimed to need was actually just a portion of the forecasted shortfall: "Unlike other water supply projects that address the full future water supply needs of an applicant projected to a specified time, the NISP Participants requested new firm yield to meet only a portion of their projected demand through 2060. The Participants are requesting 40,000 AF of new firm yield from NISP (Table 1-1)." FEIS at 1-6. The Corps explained that "[t]he requests for new firm yield are based on the Participants' analyses of their projected needs, the potential future demands as modeled by Northern Water and verified by the Corps, plus a 10% safety factor to account for uncertainty about future demand (see Section 1.3.4.5.2)." FEIS at 1-6.

121.    No explanation was given for how or why the Participants selected the particular figure of 40,000 AF and the Corps explained that even with NISP "[o]ther new sources would be needed to meet projected shortfalls." *Id.* Indeed, "[t]he Participants have continued to purchase C-BT units to add to their water supplies, acquiring about 15,800 units since DEIS issuance." *Id.* at 1-7. The Corps' attempt to explain why the 40,000 AF figure itself was an essential part of the purpose and need offered only circular logic, not an actual reason: "NISP differs from many other proposed water supply projects in that NISP Participants have requested only a portion of their projected demand through 2060 (Figure 1-3). Changes in the future demand projections, such as population projections, conservation, or benchmarks, may affect the overall future

demand, but they do not affect the need of the Participants for the 40,000 AF of firm yield from NISP, which is the need the Corps is analyzing in this FEIS." *Id.* at 1-15.

123. The alternatives screening process was also carried forward from the SDEIS without any change. It reflected the same "three levels of screening (purpose and need, environmental, and practicability) to develop a reasonable range of alternatives to be evaluated in the FEIS. Screening criteria were developed and applied to 16 Project concepts and 215 elements." FEIS at 2-2.

123. With regard to first level—the purpose and need screening—and despite serious concerns voiced repeatedly by EPA as well as Petitioner, the same rigid criteria were used requiring both a firm yield of 40,000 AF and a "regional project."

124. Specifically, "[t]he firm yield screening criterion requires that viable water supply sources must be capable of providing a firm annual water yield. This screening criterion was only applied to concepts because concepts are defined as a source of potential water supplies able to meet a portion of the Participants' needs. To pass this criterion, concepts must be able to provide at least 30% of the total requested firm annual yield of 40,000 AF, which is 12,000 AF. Limiting the provisional percentages reduces the number of water supply sources to a maximum of four, which is logistically reasonable for a regional water supply project of this magnitude." FEIS at 2-3.

125. Likewise, the regional project criterion was also retained:

The Corps determined that 'regional project' is an appropriate screening criterion for the alternatives screening process for NISP. NISP is a regional water supply project addressing a portion of the current and anticipated water supply needs of 15 Participants providing water to an area of about 945 square miles. Northern Water is the permit applicant (not the 15 individual NISP Participants). NISP would be constructed and owned by Northern Water if the Corps issues a permit. While

Northern Water would retain ownership and operational responsibility of the project, the Participants would own a perpetual contractual right to a defined portion of the project facilities and a defined portion of the water diverted by the project. Northern Water has responsibilities for water supply planning and management for the region and what it is proposing is a regional project to meet some of the water supply needs of 15 Participants. Concepts, elements, and alternatives that would not assist in providing the Participants with a common solution were eliminated from further review.

FEIS at 2-3-2-4.

126.    The final two levels of screening: environmental and practicability were also carried forward without change, including the requirement of elemental capacity, in which "elements must have a storage capacity of 25,000 AF or greater." FEIS at 2-6.

127.    Not surprisingly, the bulk of the alternatives analysis mirrored that in the SDEIS. The No Action alternative, Alternative 1, remained unchanged. The principal elements of Alternatives 2, 3 and 4 from the SDEIS were also carried forward without change. *See* FEIS Table 2-4 at 2-39. Alternative 2, as in the SDEIS, involved storage in a new Glade Reservoir with a capacity of 170,000 AF, along with the SPWCP (included in all action alternatives) with a capacity of 45,624 AF. *See id*. Similarly, Alternative 3 entailed storage of water in the new Cactus Hill Reservoir with a capacity of 190,000 AF as opposed to the Glade Reservoir. In other respects, it was similar to Alternative 2 and also included the SPWCP, with the 45,624 AF Galeton Reservoir. *See id.* at 2-83-2-84. And, as in the SDEIS, Alternative 4 mirrored Alternative 3, with a new Cactus Hill Reservoir with a capacity of 190,000 AF and the SPWCP, including the Galeton Reservoir with a capacity of 45,624 AF, with the only primary difference being that "[i]n Alternative 4, water from the Poudre River would be diverted farther downstream than the Poudre Valley Canal, with storage of the water in Cactus Hill Reservoir. Relative to the Alternative 3, Alternative 4 would allow more water to remain in the Poudre

River between the Poudre Valley Canal and the New Cache Canal before it was diverted for exchanges." *Id.* at 2-90.

128.    The only meaningful change was a slight modification of Alternative 2 to create new Alternative 2M, which was designated as the new preferred alternative: "Northern Water refined its Preferred Alternative from that presented in the SDEIS, which was Alternative 2, based on public and agency comment on the SDEIS. The Corps retained most of the components of Alternative 2, which is described in Section 2.7, for detailed analysis." FEIS at 2-53. Specifically, the storage components remained the same as in Alternative 2, but with the addition of "[t]he three primary actions to minimize effects on aquatic life," including: "1) conveying a portion of NISP deliveries from Glade Reservoir to the Participants via the Poudre River to a new Poudre River diversion, 2) implementing a peak flow operations program, and 3) avoiding diversions during critical low-flow periods." *Id.*

129.    In Appendix A to the FEIS, the Corps responded to comments received during the public comment periods for the DEIS and the SDEIS. The Corps offered only cursory responses to the repeated criticism of its artificially narrow purpose and need statement and accompanying rigid screening criteria. The Corps made the conclusory assertion that it did not unreasonably limit the range of alternatives because "[u]sing the overall project purpose developed by the Corps, 16 water supply concepts and 215 elements were evaluated and screened (DEIS Sections 2.1.3 and 2.1.4, SDEIS Sections 2.2.3 and 2.2.4 and FEIS Sections 2.2.3 and 2.2.4). The alternatives analyzed provided the Corps with a reasonable range of alternatives." FEIS at A-129. Of course, the number of concepts and elements considered is itself meaningless if the

screening criteria are so rigid as to eliminate all but a small number of very similar concepts and elements, as occurred here.

130.    Similarly, the Corps repeated its prior justifications for using the more narrow purpose and need statement and employing the "firm yield" and "regional project" screening criterion—without engaging with any of the substantive comments from EPA suggesting that the Corps use the more broad basic project purpose instead; questioning why the "regional project" criterion could not be met with a cooperative water planning effort coordinated by Northern Water; and also urging the Corps to broaden the "firm yield" criterion by adding requirements that each source provide a particular volume of water and that the source be held in perpetual ownership by Northern Water. *See* EPA Detailed Comments on the SDEIS at 9-10. The Corps simply stated again that the agency "determined that 'regional project' was an appropriate screening criterion (FEIS Section 2.2.2.1.2). The applicant (Northern Water) would retain ownership and operational responsibility for NISP. Northern Water has responsibilities for water supply planning and management for the region and what it is proposing is a regional project to meet some of the water supply needs of 15 Participants. Concepts, elements, and alternatives that would not assist in providing the Participants with a common solution were eliminated from further review." FEIS at A-128; *see also* FEIS at A-82 (responding to EPA DEIS Comments with same explanation).

131.    Likewise, the Corps' only response to criticism of the firm yield screening criteria was to repeat its earlier justification: "[w]ater supply concepts needed to provide at least 30% of the total requested firm yield of 40,000 AF, which is 12,000 AF. Limiting the provisional percentages reduced the number of water supply sources to a maximum of four, which is

logistically reasonable for a regional water supply project (FEIS Section 2.2.2.1.1)." FEIS at A-133; *see also id.* at A-81 (responding to EPA DEIS Comments with same explanation). The Corps never meaningfully responded to EPA's direct concern that this volume constraint was not necessary, was not included in the agency's 2007 alternatives report, and that there was a more inclusive option that would meet the project need.

132.     In response to the EPA's concern that the Corps was effectively requiring perpetual ownership in order for a water supply to satisfy the "firm yield" screening criterion, the Corps disputed that characterization and gave only the empty response that "[a]s discussed in FEIS Section 2.3.1.1.1, water supply concepts such as rotational fallowing do not provide a firm yield because the certainty of the supply would last only as long as the initial lease. Given the long-term uncertainty of the supply, the concept would not provide a firm yield." FEIS at A-136. Of course, by logical extension, this means exactly what the Corps claims it does not: that any lease arrangement (non-ownership) is by definition excluded.

133.     With regard to Fort Collins' proposal of a modified Alternative 4, the Corps eliminated it from further study for failure to meet the "firm yield" criterion. The Corps stated that "[t]he yield of the Grey Mountain water rights would be reduced due to capacity constraints and seepage loss associated with the Poudre Valley Canal and legal limitations imposed as a result of the change of water right application that would be required for Modified Alternative 4." And as a result of applying the rigid firm yield screen, the Corps summarily determined that "Modified Alternative 4 would not provide the Participants with 40,000 AF of new reliable municipal water supply annually" and eliminated it from further study. FEIS at 2-30.

I.        **Comments on the Corps' Final EIS**

134.      The Corps received 413 letters or emails during the FEIS comment period. *See* ROD Att. C at 1.

135.      EPA offered comments in support of the Final EIS and the updated analyses and mitigation plan in its October 4, 2018 letter to the Corps, but made no additional mention of its long-running and well-established concerns—explained in detail in both the agency's 2008 and 2015 comments—about the Corp's artificially constrained alternatives analysis and screening criteria.

136.      The City of Fort Collins also reiterated its concerns about the Corps' underestimation of impacts to the Poudre River and a lack of adequate mitigation in its October 4, 2018 letter to the Corps. In addition, the City provided a detailed suite of mitigation recommendations to address its concerns about water quality degradation; geomorphology and increased flood risk; impacts to riparian and wetland habitats; and detrimental effects on wildlife, among other impacts. The city also provided detailed comments on how to improve the Corps' concept of adaptive management in the NISP Conceptual Mitigation Plan.

137.      In its October 4, 2018 comment letter, Petitioner again repeated its concerns that the purpose and need statement was too restrictive and construed "so narrowly as to require that the project's objectives be met by a major regional reservoir project." Save the Poudre FEIS Comments (Oct. 4, 2018) at 3. In addition, Petitioner reiterated concerns that the Corps failed to consider a reasonable range of alternatives and employed overly restrictive screening criteria such that all of the action alternatives included construction of the Galeton reservoir and one other large capacity reservoir, such that the EPA itself noted it was unable to "identify a major

environmental impact difference among the action alternatives." *Id.* at 11-17. As such, Petitioner argued that the agency's "failure to rigorously explore a single action alternative that would result in lower impacts on wetlands, the Poudre River, and other resources" violates NEPA, and by extension, the agency's obligations under the CWA to select the least environmentally damaging practical alternative. *Id.* at 11-20.

**J.    Petitioner's March 2019 Letter Requesting Supplemental NEPA Review**

138.    On March 12, 2019, Petitioner submitted a formal request for supplemental NEPA review pursuant to 40 C.F.R. § 1502.9(c) notifying the Corps of significant new information relevant to the Corps' consideration of Northern Water's Section 404 permit application under the CWA. *See* Save the Poudre Letter to Army Corps of Engineers (March 12, 2019) (hereinafter "March 2019 Supplemental NEPA Request").

139.    Specifically, in February 2019, Northern Water revealed—for the first time ever—that, in order for NISP to be viable, Northern Water may have to purchase at least "25,000 acre-feet of water" from northern Colorado farmers. This new element to NISP would balloon project costs—despite the fact that the FEIS made clear that under Northern Water's preferred alternative "$0" would be spent on "water rights acquisition." FEIS at 2-103. Shortly thereafter, Northern Water unveiled its (now defunct) "WaterSecure" program implementing this new plan.

140.    In requesting supplemental NEPA analysis, Petitioner explained, by way of its attorney, that this program represented a "wholesale change to the approach Northern Water will take to acquire the water for NISP, and is a fundamentally different and highly significant modification to the project that bears directly on the proposed action, its impacts, and its alternatives." March 2019 Supplemental NEPA Request at 3. And "[g]iven the many areas of the

Final EIS that are now outdated, inaccurate, or flawed, it is imperative that the Corps update its analysis of project impacts, alternatives, and purpose and need." *Id*. at 6.

141.    The Corps determined that supplemental NEPA review was not necessary, stating in its Response to Comments that WaterSecure was "not a change in operations for Alternative 2M" because there was a single passing reference to the potential for a "share purchase with leaseback" option in the FEIS and a 2017 operational plan. *See* ROD, App'x C at 20-21, 111-12, 155.

### K.    Petitioner's April 2022 Letter Requesting Supplemental NEPA Review

142.    On April 11, 2022, Petitioner submitted another formal request for supplemental NEPA review pursuant to 40 C.F.R. § 1502.9(c) notifying the Corps of significant new information relevant to environmental concerns and "bearing on the impacts of, and feasible alternatives to, NISP." *See* Save the Poudre Letter to Army Corps of Engineers (April 11, 2022) (hereinafter "April 2022 Supplemental NEPA Request").

143.    As the plans for NISP encountered astronomically increasing project costs and mounting logistical hurdles, Petitioner became aware that Northern Water applied for a loan from the EPA's Water Infrastructure Finance and Innovation Act ("WIFIA") program in July of 2021 for $464 million in federal financing. In the process of applying for this loan, Northern Water made representations directly undercutting the need for a rigid 40,000 AF firm yield criterion, as well as the Corps' environmental analysis that flowed from that number. These representations were made under caution that any "false statements" may be subject to criminal prosecution. *See* Northern Water WIFIA Loan Letter of Interest at ii.

144.    Specifically, in its WIFIA Letter of Interest, Northern Water represented that it was *not* in fact necessary for NISP to provide the 40,000 AF at one time, as it had maintained for over a decade and as the Corps had repeatedly stated with regard to NISP's purpose and need, which the Corps utilized to rigidly screen out and eliminate alternatives from further consideration. *See* Northern Water WIFIA Loan Letter of Interest at 2. Instead, Northern Water represented in the letter that "NISP is divided into *two phases*: 1) Glade Reservoir Complex, and 2) South Platte Water Conservation Project." *Id.* at 2 (emphasis added). And that Phase 1, Glade Reservoir, "does not depend on any infrastructure of Phase 2, nor does it rely on Phase 2 for operation. It's anticipated that Phase 1 will provide approximately 20,000 acre-feet of the total 40,000 acre-feet. *Phase 1 can operate without Phase 2*, but Phase 2 will add an additional 20,000 acre-feet of reliability to NISP." *Id.* (emphases added). In other words, after years of insisting on a 40,000 AF firm yield, Northern Water revealed that actually, 20,000 AF would be adequate. Northern Water thus had a substantial level of flexibility in its firm yield criterion that had not been disclosed during either the DEIS or SDEIS. This flexibility, in turn, had obvious implications for the practicability of numerous less environmentally damaging alternatives that were discarded by the Corps specifically because they could not provide the full 40,000 AF of firm yield through a single, regional water supply solution.

145.    In requesting supplemental NEPA analysis, Petitioner explained, by way of its attorney, the implications of Northern's representations for the NISP alternatives analysis:

> The representations made by Northern Water in its WIFIA loan application make plain that NISP can feasibly operate with far fewer than the 40,000 acre-feet of water that the Corps previously analyzed as an essential requirement of any project alternative under Section 404 of the CWA and NEPA. Indeed, the Corps specifically rejected as impracticable many viable alternatives—which would result in far fewer impacts on the broader environment, including the aquatic ecosystem—

specifically because of their alleged inability to achieve the full 40,000 acre-feet purportedly required by Northern Water. Hence, Northern Water's concession that the full 40,000 acre-feet is not now necessary represents a major change to the project purpose and need. This, of course, warrants additional evaluation of alternatives to ensure that NISP is, in fact, the least environmentally damaging practicable option to achieve project proponent's current (rather than outdated) water demand needs.

April 2022 Supplemental NEPA Request at 2.

146.    However, other than a written confirmation of receipt on April 13, 2022, Petitioner received no response to this request. This lack of response stands in contrast to response issued to Petitioner's earlier 2019 request for supplemental NEPA review, noted above, in which the agency responded in a point-by-point manner. *See* ROD, App'x C at 20-21, 111-12, 155. Despite knowing that the 40,000 AF firm yield criterion was not a rigid need, the Corps refused to address this crucial new information about a parameter that had singularly shaped its alternatives screening and analysis.

## L.    2022 Record of Decision and Section 404 Permit

147.    On December 9, 2022, the Corps published its Record of Decision selecting Northern Water's preferred alternative and on January 10, 2023 issued a Section 404 Permit authorizing construction of NISP. The Corps determined that "the project has not substantially changed; there are no new significant circumstances; and there is no new significant information relevant to environmental concerns. Therefore, supplementation of the FEIS is not required under 40 CFR 1502.9(d)." ROD at 4.

148.    The alternatives identified in the FEIS were described in the ROD, after which the Corps determined that "all the action alternatives are practicable when considering cost, logistics, and existing technology, as required by 40 CFR 230.10(a)(2)." *Id.* at 12. In addition, the Corps

found that "[t]he environmentally preferable alternative is the Applicant's Preferred Alternative. The Section 404(b)(1) Guidelines require the Corps to identify the Least Environmentally Damaging Practicable Alternative (LEDPA). The Corps identified the Applicant's Preferred Alternative as the LEDPA." *Id.*

149.    In its final findings, the Corps selected Northern Water's preferred alternative, Alternative 2M, comprised of a new Glade Reservoir with a capacity of 170,000 AF, along with the SPWCP (included in all action alternatives) with a capacity of 45,624 AF and incorporating modifications to minimize impact to aquatic life. ROD at 33. Further, the Corps found that "[i]ssuance of a Section 404 Permit, with the inclusion of special conditions of the permit, as prescribed by regulations published in 33 CFR Parts 320 to 332, and 40 CFR Part 320 is not contrary to the public interest." ROD at 34.

150.    Notably, nowhere in the ROD did the Corps address Northern Water's representations in its WIFIA loan Letter of Interest—brought to the Corps' attention in April 2022 by Petitioner's supplemental NEPA request—that the claimed 40,000 AF NISP project water supply need could in fact be divided into two separate phases of 20,000 each and operate independently of each other. Nor did the Corps discuss how this critical fact undoubtedly impacted the firm yield screen the agency used to eliminate so many project concepts and elements. Despite this glaring contradiction, the Corps maintained the position throughout the ROD that the 40,000 AF was a mandatory floor for screening alternatives.

151.    In an Appendix to the ROD, the Corps purported to respond to some of the comments submitted in response to the FEIS regarding the purpose and need statement and

alternatives screening criteria, but simply repeated the justifications it supplied in the FEIS. ROD Att. C at 19-40.

152.    In multiple instances, the Corps also takes a sentence from EPA's 2015 comment letter out of context in attempt to imply a broader approval of the FEIS than EPA actually stated. In its October 4, 2018 comment letter on the FEIS, EPA stated in full the following:

> "The updated analyses in this FEIS now provide an improved assessment of project impacts, especially for temperature, flow, and water quality. Further the Final EIS includes an updated Conceptual Mitigation Plan and quantitatively assesses the benefits of proposed mitigation and build-in avoidance and minimization components of the alternatives. EPA's comments in 2008 and 2015 noted the lack of proposed mitigation for the project's primary impact, the reduction of flushing flows that sustain certain ecological functions. We appreciate that the Final EIS now includes a program to provide spring flushing flows in years when water is available. If the Final EIS's proposed mitigation plan, flow augmentation plan, and adaptive management program are included in the Record of Decision (ROD) or as conditions of the CWA Section 404 permit, EPA would consider our previously identified environmental objections to be resolved." EPA 2015 Comment Letter (Oct. 4, 2018) at 2.

153.    Thus, the "resolved" environmental objections that EPA refers to clearly relate only to the substantive impacts and mitigation aspects of the FEIS. Yet the Corps repeatedly uses this sentence out of context to suggest that the EPA also withdrew its concerns about the overly narrow purpose and need statement and the rigid "firm yield" and "regional project" screening criteria. In fact, the EPA's 2018 letter never revisits NISP's purpose and need or the flawed screening criteria used in the Corps' alternatives analysis—neither of which changed since EPA's detailed, compelling objections to them in both 2008 and 2015.

154.    The Corps also dismissed concerns about the narrow purpose and need statement, the limited range of alternatives, and the "regional project" and "firm yield" criteria, by repeating justifications from the FEIS. *See* ROD Att. C at 19-37.

155.    The Corps also failed to adopt or, in some instances, even explain the basis for ignoring the City's proposed mitigation options that could have reduced and mitigated project impacts. The City detailed its concerns repeatedly during the Corps' environmental review on everything from the risk of serious degradation of water quality in the Poudre River requiring the city to implement additional expensive water treatment systems; alterations to stream morphology and sediment transport impacting the river's channel structure, leading to storm water issues and amplifying flood risks; detrimental impacts to the riparian vegetation, aquatic habitat, and aquatic and terrestrial wildlife in the river corridor as it passes through Fort Collins; as well as the impacts of reduced river flows on recreation along the river that is vital to the Fort Collins community, among many others. *See* supra ¶¶ 87, 112-14, 136. The City also supplied expert recommendations to mitigate these harms. Yet in the end, the City's wide-ranging concerns were largely overlooked by the Corps. As such, not only did the City Council vote unanimously to oppose NISP in 2020, it has more recently emphasized that, "[i]n 2022, the City remains concerned that the current configuration of NISP is not sufficiently mitigated." *See* City of Fort Collins: Glade Reservoir NISP Project (updated Jan. 26, 2023), https://www.fcgov.com/nispreview.

## PETITIONER'S CLAIMS FOR RELIEF

### Claim 1: Violations of NEPA and the APA

156.    Petitioner hereby incorporates Paragraphs 1-155 by reference.

157.    By failing to "exercise independent judgment in defining the purpose and need for the project," 33 C.F.R. Part 325 App. B § 9(b)(4), and by artificially narrowing the purpose and

need for NISP—especially when faced with serious criticism by subject matter experts—the Corps violated NEPA, its implementing regulations, and the APA.

158.    By developing rigid screening criteria based on an overly narrow purpose and need, and by relying on those unduly rigid screening criteria to further constrain the alternatives analysis, the Corps arbitrarily eliminated from consideration alternatives that could also satisfy all or a portion of the project need, in violation of NEPA, its implementing regulations, and the APA.

159.    By failing to justify any legal or logical basis for the selected screening criteria, which artificially restricted the analysis of alternatives, the Corps violated NEPA, its implementing regulations, and the APA.

160.    By only analyzing in detail action alternatives that would include construction of two new large reservoirs and screening out all other project concepts and elements, the Corps arbitrarily refused to examine other means of meeting the basic project purpose in violation of NEPA, its implementing regulations, and the APA.

161.    By only analyzing in detail four very similar action alternatives—all of which involve the same action of constructing two new reservoirs, are largely indistinguishable in terms of environmental impacts, and fail to constitute a reasonable range of alternative means of serving the basic project purpose—the Corps is in violation of NEPA, its implementing regulations, and the APA.

162.    By failing to analyze less environmentally damaging alternatives that could satisfy the Project's purpose—whether in conjunction with elements of other alternatives or

standing alone—while causing less environmental damage than the construction of two new large reservoirs, the Corps violated NEPA, its implementing regulations, and the APA.

163.    By failing to consider in detail any action alternatives involving the construction of two smaller reservoirs as separate projects—one for the Grey Mountain water rights on the Poudre River—and a separate project to store the SPWCP water rights on the South Platte River, the Corps violated NEPA, its implementing regulations, and the APA.

164.    By failing to prepare any supplemental NEPA review when presented with new information triggering the regulatory criteria for NEPA supplementation, *see* 40 C.F.R. § 1502.9(c), and by reaching the arbitrary and capricious decision that NEPA supplementation was not required under the circumstances without providing any coherent and legally defensible explanation for this decision, the Corps violated NEPA, its implementing regulations, and Section 706(2) of the APA, *see* 5 U.S.C § 706(2).

165.    By failing to prepare any supplemental NEPA review after the Corps' legal duty to do so was triggered under NEPA, the Corps' inaction constitutes agency action "unlawfully withheld or unreasonably delayed" pursuant to Section 706(1) of the APA.

166.    For all of these reasons, Federal Respondents' actions and omissions violate NEPA, its implementing regulations, and the APA. Petitioner is harmed by these violations in the manner described in paragraphs 20-21.

### Claim 2: Violations of the CWA and the APA

167.    Petitioner hereby incorporates Paragraphs 1-155 by reference.

168.    By failing to clearly demonstrate that there are no practicable alternatives for fulfilling NISP's basic purpose (i.e., to provide supplemental water supply) that do not involve

jurisdictional wetlands or other special aquatic sites covered by the CWA, Respondents violated the CWA, its implementing regulations, and the APA.

169.     By failing to rebut the presumption that practicable alternatives exist that do not involve jurisdictional wetlands or other special aquatic sites, especially when the Corps found certain elements of action alternatives practicable that do not themselves require a Section 404, Respondents violated the CWA, its implementing regulations, and the APA.

170.     By adopting an unduly rigid overall project purpose and by artificially narrowing the range of practicable alternatives through rigid screening criteria, the Corps did not clearly demonstrate that it selected the least environmentally damaging practicable alternative that could achieve the Project's purpose, therefore violating the CWA, its implementing regulations, and the APA.

171.     By failing to provide detailed, clear, and convincing information demonstrating that the selected alternative is practicable—including that it is available and capable of being done after taking into consideration cost, existing technology, and logistics—the Corps violated the CWA, its implementing regulations, and the APA.

172.     By failing to analyze less environmentally damaging alternatives that could satisfy the Project's overall project purpose—whether in conjunction with elements of other alternatives or standing alone—while causing less environmental damage than the construction of two new large reservoirs, and by failing ultimately to select such an alternative as the least environmentally damaging practicable alternative, the Corps violated the CWA, its implementing regulations, and the APA.

173.    By failing to consider in detail any action alternatives involving the construction of two smaller reservoirs as separate projects—one for the Grey Mountain water rights on the Poudre River and a separate project to store the SPWCP water rights on the South Platte River—and by failing ultimately to select such an alternative as the least environmentally damaging practicable alternative, the Corps violated the CWA, its implementing regulations, and the APA.

174.    For all of these reasons, Federal Respondents' actions violate the CWA, its implementing regulations, and the APA. Petitioner is harmed by these violations in the manner described in paragraphs 20-21.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that the Court enter judgment for Petitioner ordering the following relief:

1.    Declaring that Respondents have violated NEPA, the CWA, and the applicable regulations implementing those statutes, and also have acted arbitrarily, capriciously, and contrary to law under the APA, and unlawfully withheld action required by law, in violation of the APA;

2.    Setting aside the Corps' July 2018 FEIS, December 2022 ROD, January 2023 CWA Section 404 Permit, and their decision not to conduct any supplemental NEPA review in response to Petitioner's April 2022 request; and remanding those matters to the Corps for further consideration consistent with federal law;

3.    Enjoining the Corps from taking any further actions in furtherance of this project until the Corps has fully complied with federal law;

4.      Awarding Petitioner its costs of litigation, including reasonable expert fees and attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable provision of law; and

5.      Granting Petitioner such further relief as may be necessary and appropriate or as the Court deems just and proper.

Respectfully submitted,

Sincerely,

*/s/ Jessica F. Townsend*
Jessica F. Townsend
(202) 780-7286
jessica@eubankslegal.com

*/s/ William S. Eubanks II*
William S. Eubanks II
(970) 703-6060
bill@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006

Counsel for Petitioner